# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 12, 2008      Decided February 10, 2009

No. 08-1147

INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA,
PETITIONER

v.

DEPARTMENT OF LABOR AND MINE SAFETY AND HEALTH
ADMINISTRATION,
RESPONDENTS

NATIONAL MINING ASSOCIATION,
INTERVENOR

———

On Petition for Review of an Order of the Federal Mine
Safety & Health Administration

———

*Judith Rivlin* argued the cause for petitioner. With her on
the briefs was *Grant Crandall*.

*Edward Waldman*, Attorney, Mine Safety & Health
Administration, argued the cause for respondents. With him
on the brief was *W. Christian Schumann*, Counsel. *Robin A.
Rosenbluth*, Attorney, entered an appearance.

*Henry Chajet* and *Harold P. Quinn* were on the brief for intervenor.

Before: GINSBURG and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In 2006, Congress passed the MINER Act with the purpose of improving mine safety. Pub. L. No. 109-236, 120 Stat. 493. Section 4 of the Act requires the Secretary of Labor to issue certain regulations concerning mine rescue teams. 30 U.S.C. § 825(e)(2). The petitioner, United Mine Workers of America, challenges several provisions of the final rule that the Mine Safety and Health Administration ("MSHA") issued pursuant to Section 4. 73 Fed. Reg. 7636/1 (Feb. 8, 2008). We hold that the final rule is inconsistent with the Act in three respects. It allows certain rescue teams to meet the requirements by training at small mines annually rather than semi-annually, and allows state employees on mine rescue teams to fulfill their obligations with participation in only one mine rescue contest per year and, even then, with service merely as a contest judge. The statute permits none of these. We therefore grant the petition with respect to those portions of the rule, and deny it in all other respects.

\* \* \*

The union's first argument concerns the Act's "small mines provision." 30 U.S.C. § 825(e)(2)(B)(iv). Among other things, this provision requires that the regulations provide "(iv) [t]hat the operator of each underground coal mine with 36 or less employees shall — ... (II) make available two certified mine rescue teams whose members —

. . . (cc) participate at least semi-annually in mine rescue training at the underground coal mine covered by the mine rescue team." *Id.* § 825(e)(2)(B)(iv)(II)(cc). This is an unambiguous requirement that each small mine must provide two certified mine rescue teams that train at that mine "at least semi-annually." MSHA's final rule, however, allows two types of rescue teams—mine-site and state-sponsored teams—to train at small mines only once a year. 30 C.F.R. § 49.20(b)(1), (b)(4). (The rule requires semi-annual training for "contract" and "composite" teams. *Id.* § 49.20(b)(2), (b)(3).)

MSHA's only argument in defense of its apparent violation of the statutory text is a creative but fruitless one. It focuses on the last of the requirements imposed on the rescue teams operating at small mines, which states that they must be "comprised of individuals with a minimum of 3 years . . . experience that shall have occurred within the 10-year period preceding their employment on the contract mine rescue team." 30 U.S.C. § 825(e)(2)(B)(iv)(II)(ff). From this provision it generates a three-step justification: (1) This last requirement can only be met by contract teams; (2) because the word "and" connects this requirement with the other five, they must be read conjunctively, so that "all listed criteria must be fulfilled," Respondent's Br. at 19; (3) therefore "one can read the statutory language to mean that the six criteria apply to members only of contract rescue teams." *Id.*

Assuming arguendo that MSHA's first two steps are reasonable, the third does not follow. The logical implication of the first two steps is simply that only contract teams could meet the requirements. This would not undercut the language requiring that each team must train at the mine at least semi-annually.

4

* * *

Section 4 of the MINER Act also requires rescue teams serving both large and small mines to participate in two local mine rescue contests each year. 30 U.S.C. §§ 825(e)(2)(B)(iii)(I)(bb)(BB), (iv)(II)(bb). The union challenges four aspects of MSHA's implementation of this requirement.

First, the union argues that the final rule violates the requirement by allowing mine rescue team members who are state employees with certain job duties to "substitute their regular job experience for 50 percent of the training requirements," (i.e., for one of the two contests each year). 30 C.F.R. § 49.11 (table). In allowing some team members to participate in only one contest per year, the final rule once again directly contravenes explicit statutory language. In its brief, MSHA does not even attempt to argue that the final rule constitutes a plausible interpretation of the statute. It argues instead that the experience of the state employees "is, at the least, the functional equivalent of the training they would gain in participating in one mine rescue team contest." Respondent's Br. at 34. The statute, however, requires two mine contests, not their functional equivalent.

The union's second argument presents a closer question. It suggests that MSHA also erred by allowing state employees to fulfill the rescue contest requirement by judging a contest, rather than participating in it as a contestant. 73 Fed. Reg. 7643/2-3. As a purely linguistic matter, it might not seem unreasonable to say that a contest judge "participated" in a contest. But in this particular context, we are convinced that MSHA's interpretation is unreasonable. This conclusion follows from MSHA's own understanding of the rescue contest requirement—an understanding we believe is compelled by the statute.

In its analysis of the proposed rule, MSHA described mine rescue contests as "opportunit[ies] to test the team member's level of knowledge and skill under simulated mine emergency conditions." 72 Fed. Reg. 51326/3. It noted that the experience of "being timed, observed, and judged provides a measure of stress" and that "[t]he ability to make correct decisions quickly, while under stress and wearing breathing apparatus, is a vital skill for each mine rescue team member to develop." *Id.* The same themes appeared in the analysis of the final rule. Rescue contests "sharpen skills" and "provide[] individuals with practical, hands-on experience." 73 Fed. Reg. 7641/1. MSHA describes the role of judges in terms that focus on their contributions to the *teams'* experience. The contest judges "evaluate teams and provide a written evaluation and score after each contest," determining whether each team "demonstrates acceptable skills to be certified," thereby allowing the team to "learn from constructive feedback and their experiences during contests." *Id.* at 7641/2. In addition, MSHA used the fact that rescue teams would receive objective evaluation in mine contests to argue that its approach satisfied the Act's certification requirements. *Id.* at 7643/1; see also 30 U.S.C. § 825(e)(2)(B)(ii). In explicitly demanding experiential education, Congress can hardly have had in mind the relatively cerebral, hands-off activity of evaluation, no matter how instructive. Accordingly, MSHA's conclusion that one can participate in a mine contest by judging is at odds with the statutory language.

The union's remaining challenges to MSHA's implementation of the rescue contest requirement are without merit. The first is the claim that MSHA improperly classifies Mine Emergency Response Development ("MERD") exercises as mine rescue contests. The union has not identified, however, any feature of a mine rescue contest that such an exercise would lack. In a compliance guide for the rescue team regulations, see U.S. Department of Labor, Mine

Safety and Health Administration, Mine Rescue Teams; Final Rule: Questions and Answers, 9-11 (Apr. 2008), the Secretary has paraphrased the regulatory requirements for regular mine contests as seven criteria, and has promulgated the *identical* criteria for MERD exercises. These requirements include the use of MSHA-recognized rules; a minimum of three teams competing; one or more problems with a determined winner; and evaluation by judges. *Id.* The union points to no feature of the governing regulation, 30 C.F.R. § 49.60, that is not replicated for MERD exercises. MSHA's interpretation is clearly reasonable.

The union further objects to MSHA's provision that a contest "[h]as one or more problems conducted on one or more days." *Id.* § 49.60(a)(4). According to the union, this means that a single two-day contest could meet the two contest requirement. Petitioner's Br. at 23. But nothing in the statute precludes a rule allowing two contests' being held on consecutive days. It is reasonable for MSHA to allow for that possibility, provided that each of the contests meets all of the statutory requirements.

\* \* \*

The union also challenges MSHA's implementation of the Act's certification and training requirements. Both of these challenges fail. With respect to certification, the Act requires MSHA to "establish, and update every 5 years thereafter, criteria to certify the qualifications of mine rescue teams." 30 U.S.C. § 825(e)(2)(B)(ii). The union claims that MSHA violated those instructions by vesting the certification obligation in mine operators, rather than handling certification itself. 30 C.F.R. § 49.50(a). But the Act merely requires MSHA to establish the certification criteria; it does not specify who is to determine whether particular mine rescue

teams have met the criteria. MSHA's choice was reasonable, and consistent with Congress's statement that mine operators "have the primary responsibility to prevent the existence of [unsafe and unhealthful] conditions and practices" at their mines. 30 U.S.C. § 801(e).

In its reply brief, the union attempts to morph this claim into an argument regarding the adequacy of the certification criteria themselves. But it has forfeited that distinct argument by failing to advance it in its opening brief. *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983).

The union's argument concerning the on-site training requirement is equally unavailing. The MINER Act requires mine rescue teams to train at the underground coal mine covered by the team; the frequency of the training varies by type of team. 30 U.S.C. § 825(e)(2)(B)(iii)(I)(bb)(CC), (II)(bb)(BB), (II)(bb)(CC)(aaa), (iv)(II)(cc). In implementing these provisions, MSHA required that "a portion of the training must be conducted underground," 30 C.F.R. § 49.20(d), but declined to specify any minimum time to be spent underground. 73 Fed. Reg. 7641/1. The union contends that this decision is arbitrary and capricious. But the statute does not speak to how much time has to be spent underground, and MSHA sensibly observed that "the amount of time required to familiarize teams with a particular mine will vary" and that "teams may need more time to become familiar with complex mines and newer team members may require more time to achieve this familiarity." *Id.* In light of these considerations, MSHA decided not to impose a set minimum of underground time at each mine. *Id.* We see nothing arbitrary or capricious about this reasoning.

\* \* \*

Finally, the union notes that the MINER Act requires the regulations to be "finalized and in effect" within 18 months of the Act's enactment, 30 U.S.C. § 825(e)(2)(A), which means they were to be in place by December 2007. In fact, MSHA issued the final rule only in February 2008, with staggered implementation provisions that delayed full compliance until February 2009. 73 Fed. Reg. 7636/1. Now, as a result of our remand, MSHA will have to take further action. The union, anticipating at least some measure of substantive victory, urges us, in light of "the statutory timetable showing that Congress intended speedy action, and the Agency's initial failure to meet its mandated schedule," Petitioner's Br. at 32-33, to impose a scheduling order and to retain jurisdiction. See *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70, 79-81 (D.C. Cir. 1984).

We know of no case, however, where a court has taken an agency's failure to meet a statutory deadline (itself not automatically indicative of unreasonable delay, see *id.* at 80) as a springboard for imposing time limits on a remand. The final rule, though delayed, has now been issued; the modifications required by this opinion, obviously, have not yet been delayed. We have no reason to assume that MSHA will not proceed expeditiously. We therefore decline to impose a scheduling order or to retain jurisdiction.

\* \* \*

In sum, the final rule violates the Act by allowing certain teams to train at their mines annually rather than semi-annually, and by allowing certain state employees to substitute their job duties for one of the two required rescue contests and to meet the contest requirement by serving as a judge.

Accordingly, we vacate those portions of the rule and remand to MSHA for further consideration. We deny the petition in all other respects.

*So ordered.*